IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 18, 2021 Session

**JAMES P. LITTLE, M.D. ET AL. v. CITY OF CHATTANOOGA, TENNESSEE**

**Appeal from the Chancery Court for Hamilton County**
**No. 11-0407  Jeffrey M. Atherton, Chancellor**

———————————————————

**No. E2020-01414-COA-R3-CV**

———————————————————

This is a mandamus action in which the plaintiffs seek to compel the City of Chattanooga ("the City"), pursuant to Tennessee Code Annotated § 6-51-108(e), to complete the plans of services arising from a 1972 annexation and to publish annual reports of its progress pursuant to Tennessee Code Annotated § 6-51-108(c). Two areas of the 1972 annexation are at issue: (1) an area known as "Tiftonia" or "Area 4" and (2) an area known as "Wauhatchee–Williams Island" or "Area 12." The plaintiffs also seek a declaration that all annexations by the City since 1981 were void due to the City's violation of Tennessee Code Annotated § 6-51-102(b)(5), which prohibits a municipality from annexing additional territory while in default on a prior plan of services. After three years of trial preparation, but prior to trial, the court imposed monetary sanctions against the City under Tennessee Rule of Civil Procedure 37.03 in the amount of $263,273.08 for attorneys' fees, costs, and expenses caused by the City's failure to supplement discovery responses. Thereafter, the case was tried in three phases. Following the first phase of the trial in 2017, the court found the City complied with its obligations as to Area 4; however, it found the City "materially and substantially failed to comply" with its obligations to provide street paving, street construction, and sanitary sewers in Area 12. Following the second phase of the trial in 2019, the court found the City's failure to comply with its obligations as to Area 12 was not excused in that it was not caused by "unforeseen circumstances." As a consequence, the court ordered the City to submit a proposed scope of services to be provided, which would, *inter alia*, be the subject of the Phase 3 trial. After the third and final phase of the trial in 2020, the court found the City's proposed scope of services was insufficient and issued a writ of mandamus ordering the City to bring all streets up to current standards and install, *inter alia*, a gravity-fed sewer system for Area 12 within 48 months. The court also ordered the City to publish annual reports of its progress and enjoined the City from further annexations until the services were provided. Finally, the court found the plaintiffs were not entitled to additional relief for the City's past violations of §§ 6-51-102(b)(5) and -108(c). Both parties appealed. The plaintiffs contend, *inter alia*, that the trial court erred

by finding the City complied with the plan of services for Area 4 and by denying their request for additional relief under §§ 6-51-102(b)(5) and -108(c). The City contends that § 6-51-102(b)(5) and § 6-51-108(c) and (e) do not apply to the annexations of Area 4 and Area 12 because the statutes were enacted after the annexation ordinances were passed. The City also contends that the plaintiffs lack standing, and that their claims are barred by the doctrine of laches and the applicable statute of limitations. In the alternative, the City asserts that the trial court erred by finding it failed to materially and substantially comply with the plan of services for Area 12. The City also appeals the trial court's award of sanctions for noncompliance with discovery under Rule of Civil Procedure 37.03. Following a thorough review, we reverse and modify the trial court's judgment regarding the standards that apply to the City's provision of street paving and construction in Area 12; vacate its judgment regarding the City's provision of sanitary and storm sewers in Areas 4 and 12; and remand for further proceedings consistent with this opinion. We affirm the court's judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, Vacated in Part, and Remanded.**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Rebecca Mary Little, Chattanooga, Tennessee, for the appellants, Little Company of Tennessee, LLC, and James P. Little.

Phillip Alden Noblett, Joseph Allen Kelly, and Keith J. Reisman, Chattanooga, Tennessee, for the appellee, City of Chattanooga.

## OPINION

### FACTS AND PROCEDURAL BACKGROUND

In 1972, the City of Chattanooga passed ordinances to annex several adjacent territories into its corporate limits, including an area known as "Tiftonia" or "Area 4" and an area known as "Wauhatchee–Williams Island" or "Area 12." Before the annexations, the City adopted plans of services for each territory that identified the municipal services the City would extend into each territory and projected a timeline for each service ("the Plans of Services"). The validity of the annexations was challenged and upheld in two quo warranto actions. *See State ex rel. Hicks v. City of Chattanooga*, 513 S.W.2d 780 (Tenn. 1974); *State ex rel. Hudson v. City of Chattanooga*, 512 S.W.2d 555 (Tenn. 1974), *superseded by statute on other grounds*, Act of Mar. 28, 1974, 1974 Tenn. Public Acts 1115, *as recognized in City of Kingsport v. State ex rel. Crown Enterprises, Inc.*, 562 S.W.2d 808 (Tenn. 1978).

Nearly 40 years later, in May 2011, Dr. James Little and the Little Company of Tennessee, LLC[1] (collectively, "Plaintiffs"), commenced this action by filing a complaint against the City in the Hamilton County Chancery Court. Plaintiffs' claims were based on three statutes: Tennessee Code Annotated §§ 6-51-108(c), -108(e), and -102(b)(5). Section 6-51-108(c) requires municipalities to publish annual updates regarding the extension of services for each annexed territory and permits property owners to enforce the reporting requirement in a mandamus action. Section 6-51-108(e) permits property owners to enforce the plan of services in a mandamus action. Section 6-51-102(b)(5) prohibits municipalities from annexing any additional territory if they are "in default" on a prior plan of services.[2]

In the initial Complaint, filed in 2011, Plaintiffs contended that the City failed to complete the plan of services for Area 12 ("the Area 12 Plan of Services") and never published any progress reports. More specifically, Plaintiffs alleged that the City failed to provide Area 12 with adequate streets, street lighting, storm sewers, and sanitary sewers. Plaintiffs sought writs of mandamus to compel the City to prepare the progress reports and complete the Area 12 Plan of Services. Plaintiffs also requested an injunction to prohibit the City from annexing any other territory until the services were provided. In its Answer, the City asserted the reporting requirement in § 108(c) was inapplicable to the Area 12 because § 108(c) was enacted two years after the annexation ordinances were passed. Regardless, the City asserted that the Area 12 Plan of Services was complete.

Over the next two years, the parties engaged in discovery, and Plaintiffs amended their Complaint several times. Then, in September 2013, both parties moved for summary judgment on all claims. The trial court denied those motions,[3] and the parties proceeded to a trial in February 2014. On the second day of trial, however, the City announced that it had discovered a discrepancy between the map of Area 12 attached to the Area 12 Plan of Services and the descriptions of Area 12 attached to the Area 12 Plan of Services and annexation ordinance. The discovery revealed that a portion of Plaintiffs' property was in

---

[1] The Little Company of Tennessee, LLC was added as a plaintiff in 2013 after Dr. Little quitclaimed his interest in several properties to himself and the Little Company as joint tenants in common. A third plaintiff, Lucy D. Fryar, was added in 2012; however, the court dismissed Ms. Fryar's claims in 2014 after she sold her property. Ms. Fryar is not a party to this appeal.

[2] When Plaintiffs filed their Complaint in 2011, the reporting requirement was codified at Tennessee Code Annotated § 6-51-108(b) and the right to enforce a plan of services was codified at Tennessee Code Annotated § 6-51-108(d). An amendment in 2013 added a new subsection (b), and redesignated the existing subsection (b) and the remaining subsections accordingly. *See* Act of Apr. 19, 2013, § 1, 2013 Tenn. Pub. Acts 1489, 1489. We will refer to the statutes throughout this opinion using their present designations.

[3] The trial court granted summary judgment on Plaintiffs' claim for unjust enrichment, which is not subject to this appeal.

Area 4. The parties agreed to continue the trial to allow Plaintiffs to amend their Complaint and conduct discovery regarding the services provided to Area 4.

In their Fifth Amended Complaint, Plaintiffs alleged that the City failed to complete the Area 12 Plan of Services and the plan of services for Area 4 ("the Area 4 Plan of Services") (collectively, "the Plans of Services") and never published any progress reports for Area 12 or Area 4. As before, Plaintiffs alleged that the City failed to provide adequate streets, street lighting, storm sewers, and sanitary sewers, and sought writs of mandamus to compel the City to prepare the progress reports and complete the Plans of Services. Plaintiffs also sought an injunction against further annexations until the services were provided.

On February 26, 2014, Plaintiffs filed a Motion for Default Judgment and/or Other Appropriate Sanctions "pursuant to T.C.A. § 6-51-108 and Rules 34A.02, 37.04, and 37.02 of the Tennessee Rules of Civil Procedure." At issue was the discrepancy between the depiction of the boundary lines for Area 12 in the map attached to the Area 12 Plan of Services—Chattanooga City Resolution 9166, approved and adopted on January 25, 1972—and the depiction of the boundary lines for Area 12 in the map attached to the annexation ordinance—Chattanooga City Ordinance 6393, approved and adopted on third and final reading on February 2, 1972. Plaintiffs alleged that the City should have known about and disclosed the discrepancy at an earlier date. After a hearing, the trial court found that the City failed to timely supplement its discovery responses and imposed, pursuant to Tennessee Rule of Civil Procedure 37.03, monetary sanctions of $263,273.08 for attorneys' fees, costs, and expenses Plaintiffs had incurred.

In October 2015, both parties moved for summary judgment on Plaintiffs' claims related to Area 4. The City argued, *inter alia*, that Plaintiffs were not entitled to relief under §§ 6-51-102(b)(5), -108(c), and -108(e) because those provisions were not enacted until after the 1972 annexations were complete. The City also asserted that Plaintiffs' claims were barred by the applicable statute of limitations. The trial court denied the motions.[4]

In February 2017, Plaintiffs filed a "renewed" Motion for Summary Judgment on the City's failure to comply with the reporting requirement in § 108(c). Plaintiffs asked the court for a writ of mandamus compelling the City to retroactively issue reports for every year since the annexations. The City responded by filing a motion to reconsider its Motion for Summary Judgment on whether § 108(c) applied retroactively to the 1972 annexations. The trial court denied the City's Motion to Reconsider and reserved its ruling on Plaintiffs' motion.

---

[4] The trial court also granted permission to file interlocutory appeals, but the applications to appeal were denied by this court in July 2016.

While Plaintiffs' renewed Motion for Summary Judgment was still pending, the parties proceeded to trial in July 2017. During trial, the court heard from 23 witnesses and received approximately 175 exhibits into evidence regarding whether the City "materially and substantially failed to comply" with the Plans of Services.

In its Order of December 11, 2018,[5] the court found the City complied with the Area 4 Plan of Service but not the Area 12 Plan of Services. In particular, the trial court found the City failed to comply with its obligations to provide street services and sanitary sewers to Area 12. But the court found it could not issue a writ of mandamus until the City was given an opportunity to show cause for its noncompliance because § 6-51-108(e) provides that "[i]f the court finds that the municipality has materially and substantially failed to comply with its plan of services . . . , then the municipality shall be given the opportunity to show cause why the plan of services was not carried out." In the same order, the court ruled on Plaintiffs' renewed Motion for Summary Judgment related to the reporting requirement in § 108(c). The court found that § 108(c) allowed the court to require progress reports going forward, but the court found that § 108(c) provided no remedy for past reporting violations.

The parties proceeded to the second phase of trial in September 2019 on the issue of whether the City's failure to comply was caused by "unforeseen circumstances." In particular, the City contended that its failure to comply was caused by a loss of federal funding and the impossibility of regulatory approval for sewer systems in the undeveloped portions of Area 12. After hearing from four witnesses, receiving nine new exhibits, and considering the parties' post-trial briefs, the trial court found that neither reason excused the City's noncompliance. Thus, the court found Plaintiffs were entitled to a writ of mandamus compelling the completion of the Area 12 Plan of Services, which compelled the third and final phase of trial. Accordingly, the court ordered the City to submit, in advance of trial, a proposed scope of services to be provided and a timetable for compliance. The City complied with the order.

At issue in the third and final phase of the trial was the City's proposed plan for the completion of streets and sanitary sewers in Area 12. Plaintiffs did not present an alternative proposal, but they objected to the City's plan because it left out several portions of Area 12 and specified "grinder" rather than "gravity" sewer systems. Plaintiffs argued that the grinder systems were insufficient to provide for the future development of the area. Plaintiffs also argued that the City's plan was inadequate because it failed to meet the City's current road design and construction standards. Regarding § 102(b)(5), Plaintiffs argued that the City had violated the statute multiple times since 1972 by annexing additional territory while in default on the Area 12 Plan of Services. Plaintiffs asserted that they were

---

[5] The trial court's order was not entered until December 2018 due to a delay in the preparation of transcripts and the submission of post-trial briefs.

entitled to "additional relief" for the City's actions, including an order voiding all annexations occurring after the City "defaulted" on the Area 12 Plan of Services.

The trial court accepted the City's proposed 48-month timeline, but the court found that the scope of services outlined in the City's plan was insufficient. The court ordered the City to install gravity sewer systems for all of Area 12 and bring all roadways up to current standards. The trial court also found that Plaintiffs were not entitled to any additional relief under § 102(b)(5).

This appeal followed.

## ISSUES

Both parties have raised several issues on appeal. As an initial matter, however, we note that our consideration of these issues is substantially hindered by the parties' failure to comply with the Tennessee Rules of Appellate Procedure and the Rules of the Court of Appeals of Tennessee in their briefs.

"Review generally will extend only to those issues presented for review." Tenn. R. App. P. 13(b). Accordingly, appellate briefs must contain a "statement of the issues presented for review." Tenn. R. App. P. 27(a)(4). Within the issue statement, "[a] separate issue should be presented for each error raised in the appellate court." *State v. Williams*, 914 S.W.2d 940, 948 (Tenn. Crim. App. 1995) (citing *Leeson v. Chernau*, 734 S.W.2d 634, 637 (Tenn. Ct. App. 1987)). Subject to some exceptions, "issues are properly raised on appeal . . . when they have been raised and preserved at trial and . . . when they have been presented in the manner prescribed by Tenn. R. App. P. 27." *Hodge v. Craig*, 382 S.W.3d 325, 334 (Tenn. 2012) (footnote omitted).

Tennessee Rule of Appellate Procedure 27(a)(7) requires briefs to include an argument setting forth "the contentions of the appellant **with respect to the issues presented**, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate **references to the record** . . . relied on." (Emphasis added). Likewise, Tennessee Court of Appeals Rule 6(a) requires written argument for each issue on appeal with specific citations to the record:

(a) **Written argument in regard to each issue on appeal shall contain**:

(1) A statement by the appellant of the alleged erroneous action of the trial court which raises the issue and a statement by the appellee of any action of the trial court which is relied upon to correct the alleged error, **with citation to the record where the erroneous or corrective action is recorded**.

(2) A statement showing how such alleged error was seasonably called to the attention of the trial judge **with citation to that part of the record where appellant's challenge of the alleged error is recorded**.

(3) A statement reciting wherein appellant was prejudiced by such alleged error, **with citations to the record showing where the resultant prejudice is recorded**.

(4) A statement of each determinative fact relied upon **with citation to the record where evidence of each such fact may be found**.

(Emphasis added).

Under Tennessee Court of Appeals Rule 6(b), "[n]o complaint of or reliance upon action by the trial court will be considered on appeal unless the argument contains **a specific reference** to the page or pages of the record where such action is recorded," and "[n]o assertion of fact will be considered on appeal unless the argument **contains a reference** to the page or pages of the record where evidence of such fact is recorded." Thus, a failure to comply with these rules may have significant consequences. "An issue may be deemed waived, even when it has been specifically raised as an issue, when the brief fails to include an argument satisfying the requirements of Tenn. R. App. P. 27(a)(7)." *Hodge*, 382 S.W.3d at 335; *see also Bean v. Bean*, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000) ("Plaintiff's failure to comply with the Rules of Appellate Procedure and the rules of this Court waives the issues for review." (citations omitted)).

The rules governing appellate briefs are of particular importance when, as here, the record is voluminous. *See Nat'l Advert., Inc. v. McCormick Ashland City & Nashville R.R.*, 936 S.W.2d 256, 259 (Tenn. Ct. App. 1996) ("Though we ordinarily are not inclined to invoke Rule 6(b) when a party raises a legitimate issue, we must do so in this case because of the sheer size of the record."). "[W]hen placed in the position of having to review volumes of extraneous, unnecessary, and irrelevant filings, our goal is hindered and the interests of judicial economy are stymied." *Mitchell v. Jackson Clinic, P.A.*, 420 S.W.3d 1, 3 n.3 (Tenn. Ct. App. 2013). More important, "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her." *Sneed v. Bd. of Prof'l Resp. of Supreme Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010). The appellate record in this case consists of 41 technical record volumes, 45 transcript volumes, and nearly 200 exhibits.

Plaintiffs raise seven issues, and the City raises four "overarching issues" with 20 "sub-parts." "[T]he number of issues presented for review rests within the discretion of counsel," and "[w]e will not dictate to counsel how he must represent his client or limit his strategy." *State v. Draper*, 800 S.W.2d 489, 500 (Tenn. Crim. App. 1990). Still, "the brief counsel submits to this Court *must* comport with the Tennessee Rules of Appellate Procedure." *Id.* Compliance with the rules "is no mere technicality." *Owen v. Long Tire,*

*LLC*, No. W2011-01227-COA-R3-CV, 2011 WL 6777014, at \*4 (Tenn. Ct. App. Dec. 22, 2011). Here, the parties' appellate briefs fail to comply in several regards with both the letter and the spirit of the Rules of Appellate Procedure and the rules of this court.

Plaintiffs' statement of the issues includes seven issues:

1. Whether the chancery court erred in failing to issue a writ of mandamus to require reporting pursuant to Tenn. Code Ann. § 6-51-108(c) at the beginning of proceedings.

2. Whether the chancery court imposed an incorrect legal burden on Plaintiffs to prove material and substantial noncompliance.

3. Whether the chancery court abused its discretion when it found that the City did not materially and substantially fail to comply with the plan of services for Area 4.

4. Whether the chancery court abused its discretion when it denied Plaintiffs' request to amend their complaint to invoke the Tennessee Declaratory Judgment Act.

5. Whether the chancery court erred by failing to provide any remedy or penalty for the City's willful violations of Tenn. Code Ann. § 6-51-102(b)(5).

6. Whether the court erred by omitting 1,300 deannexed acres in area 12 from its writ of mandamus.

7. Whether the chancery court abused its discretion by failing to award additional relief under the extraordinary circumstances of this case.

However, throughout the argument section of their brief, Plaintiffs allege erroneous actions of the trial court **without citation to the record where the alleged erroneous action is recorded.** *See* Tenn. Ct. App. R. 6(a)(1). Plaintiffs also rely on numerous facts **without citation to the record where evidence of each fact may be found.** *See* Tenn. Ct. App. R. 6(a)(4). Significantly, Plaintiffs include **no** citation to the record in the argument for their second, fifth, sixth, and seventh issues. Plaintiffs provide only one citation to the record in the argument for their first and fourth issues. Moreover, many of Plaintiffs' citations are missing pertinent information. In the argument for their third issue—"Whether the chancery court abused its discretion when it found that the City did not materially and substantially fail to comply with the plan of services for Area 4"—Plaintiffs refer to evidence allegedly overlooked by the trial court, but Plaintiffs' citations consist of transcript page numbers without a volume number. *See* Tenn. Ct. App. R. 3(a) ("All references to the record shall be by volume and page number."). This omission is

significant because the appellate record contains **45 volumes** of non-consecutively paginated transcripts.

The City's appellate brief suffers from its own issues. The City's statement of issues raises 20 issues, which we recite verbatim:

I. Gateway Errors: The Trial Court Erred in Hearing this Matter on the Merits.

1. Whether there exists a private cause of action to enforce the provisions of Tenn. Code Ann. § 6-51-102(b)(5).

2. Whether the trial court had subject matter jurisdiction to hear this matter or any part thereof.

3. Whether the provisions of Tenn. Code Ann. § 6-51-102(b)(5) may be retroactively applied to an annexation that was enacted on February 2, 1972.

4. Whether the provisions of Tenn. Code Ann. § 6-51-108(e) may be retroactively applied to an annexation that was enacted on February 2, 1972.

5. Whether the Plaintiffs had standing to make the claims in this matter since they were not an aggrieved party at the time of annexation.

6. Whether the claims made by the Plaintiffs were barred by the applicable statute of limitations.

7. Whether the claims made by the Plaintiffs were barred by the doctrine of laches.

8. Whether the claims made by the Plaintiffs were barred by the doctrine of res judicata.

II. The Court Incorrectly Applied the Law to Whether the City Materially and Substantially Failed to Comply with its Plan of Services.

9. Whether the trial court erred when it held that the City materially and substantially failed to comply with its Plan of Services for Area 12.

10. Whether the trial court erred when it considered extrinsic evidence to interpret the unambiguous Area 12 Plan of Services.

11. Whether the trial court erred when it held that the City's failure to materially and substantially comply with its Plan of Services for Area

12 was not due to natural disaster, act of war, act of terrorism, or reasonably unforeseen circumstances beyond the control of the municipality that materially and substantially impeded the ability of the City to carry out the plan of services.

III. The Court Ordered a Mandamus in Error.

12. Whether the trial court erred when it issued a writ of mandamus to compel the municipality to provide additional services to Area 12.

13. Whether the trial court erred when it issued a writ of mandamus establishing a timetable for the provision of the additional services in Area 12.

14. Whether the trial court erred when it enjoined the City from any further annexations until the services subject to the court's order had been provided to the court's satisfaction.

15. Whether the trial court erred when it held that the City may not annex any other territory because the City was in default on the Area 12 Plan of Services.

IV. The Court improperly awarded Rule 37 Attorney's fees to Plaintiffs and no recovery for Attorney's fees is authorized under TCA 6-51-102 or 6-51-108 or otherwise in this litigation.

16. Whether the trial court erred when it sanctioned the City and required the City to pay Plaintiffs' attorney fees and cost for discovery related to Area 4 after the City disclosed that Plaintiffs and the City had over a period of years failed to notice that the map on the Area 12 Plan of Service Resolution differed from the maps on the Area 12 and Area 4 Annexation Ordinances even though the legal descriptions were correct.

17. Whether the awards of attorney fees and cost related to Area 4 discovery sanctions were in the correct amounts.

18. The Trial Court Correctly ruled that in all other respects, Plaintiffs are not entitled to attorney's fees under any theory.

V. Other Issues:

19. Whether the trial court erred when it failed to enter a stay of all its orders requiring capital costs for construction of sewers and roads in Area 12 while this case was pending on appeal.

20. The Trial Court Correctly Ruled Plaintiff Could not Amend its Complaint after Eleven Years to add new causes of action.

Although the City's brief includes a section for each of the "overarching issues," it does not include a section for each of the "sub-issues." Instead, in a footnote to each section of the argument, the City invites the reader to go on something of a treasure hunt by listing what "issues are addressed in this section." Given the multitude of issues raised, this strategy does not comport with the spirit of Rule of Appellate Procedure 27(a)(7). And like Plaintiffs' brief, the City's argument section suffers from incorrect, missing, and irrelevant citations. When arguing that the trial court incorrectly denied the City's Motion for Summary Judgment and Motion for Reconsideration, the City provides a cite to the motions but not the orders denying those motions. *See* Tenn. Ct. App. R. 6(a)(1). In support of its argument that the trial court "incorrectly held that the City had not met the requirements of the Plan of Services for Area 12," the only citations are to transcripts from a deposition that was **not** admitted into evidence.

"[T]he Rules of Appellate Procedure, are 'laws' of this state, in full force and effect, until such time as they are superseded by legislative enactment or inconsistent rules promulgated by this Court and adopted by the General Assembly." *Tennessee Dep't of Hum. Servs. v. Vaughn*, 595 S.W.2d 62, 63 (Tenn. 1980). We are mindful, however, that the Rules "should be interpreted and applied in a way that enables appeals to be considered on their merits." *Fayne v. Vincent*, 301 S.W.3d 162, 171 (Tenn. 2009). Accordingly, we may "suspend or relax some of the rules for good cause." *Paehler v. Union Planters Nat. Bank*, 971 S.W.2d 393, 397 (Tenn. Ct. App. 1997); *see* Tenn. R. App. P. 2; Tenn. Ct. App. R. 1(b).

Considering the foregoing, we restate and consolidate the issues to be addressed in this appeal as follows:

I. Whether Plaintiffs had standing to seek a declaratory judgment that all post-1981 annexations by the City are void due to the City's violation of Tennessee Code Annotated § 6-51-102(b)(5).

II. Whether the trial court erred in its application of Tennessee Code Annotated § 6-51-108(c).

(1) Whether the trial court erred by enforcing the reporting requirement in § 6-51-108(c) when the annexation of Areas 4 and 12 occurred in 1972 and the reporting requirement was not enacted until 1974.

(2) Whether the trial court erred by declining to order the City to publish a report of its progress under § 6-51-108(c) before discovery began.

- 11 -

III. Whether the trial court erred in its application of Tennessee Code Annotated § 6-51-108(e).

    (1) Whether the trial court erred by retroactively applying the right of mandamus in § 6-51-108(e).

    (2) Whether Plaintiffs have standing as "aggrieved" property owners to bring a claim under § 6-51-108(e).

    (3) Whether the trial court erred by finding Plaintiffs' claim under § 6-51-108(e) was not barred by the statute of limitations in Tennessee Code Annotated § 28-3-110(a)(3).

    (4) Whether the trial court erred by finding Plaintiffs' claim under § 6-51-108(e) was not barred by the doctrine of laches.

    (5) Whether the trial court applied the incorrect burden of proof under § 6-51-108(e).

    (6) Whether the trial court erred by finding the City "materially and substantially failed to comply" under § 6-51-108(e) with the Area 12 Plan of Services but not the Area 4 Plan of Services.

    (7) Whether the trial court erred when it found the City failed to show cause under § 6-51-108(e) for its failure to comply.

    (8) Whether the trial court exceeded its authority when it issued a writ of mandamus under § 6-51-108(e) that specified where and what type of sewers and streets the City must construct.

IV. Award of Attorneys' Fees

    (1) Whether the trial court erred when it awarded sanctions under Tennessee Rule of Civil Procedure 37.03.

    (2) Whether the trial court should have awarded attorneys' fees to Plaintiffs as additional relief.

**ANALYSIS**

I. STANDING UNDER TENNESSEE CODE ANNOTATED § 6-51-102(B)(5)

The issue, as restated, is whether Plaintiffs had standing to seek a declaration that the City's violation of Tennessee Code Annotated § 6-51-102(b)(5) entitled them to relief.

- 12 -

In Count II of their Complaint, Plaintiffs alleged that the City violated § 6-51-102(b)(5) by annexing additional territory while in default on the Plans of Services for Area 4 and 12. Plaintiffs later moved to amend Count II to seek "additional relief" under the Declaratory Judgment Act.[6] Plaintiffs requested a declaration that all annexations by the City after it defaulted on the Area 12 Plan of Services were void. Plaintiffs asserted that they were injured by the City's violation of § 102(b)(5) because the other annexations redirected resources away from Area 12. In its Order of September 14, 2020, the court ruled that Plaintiffs were not entitled to relief for the City's past violations of § 102(b)(5) because Plaintiffs elected their remedy by bringing a mandamus action under § 108(e). The court found that allowing Plaintiffs to seek an additional remedy would be inconsistent with the nature of a mandamus action, which is available only when "there is no 'plain or adequate remedy.'"

We agree with the trial court's conclusion that Plaintiffs were not entitled to additional relief under § 102(b)(5), but we do so on slightly different grounds than those relied upon by the trial court.

Tennessee Code Annotated § 6-51-102(b)(5) does not expressly create a private right of action. It may, however, provide the basis for a declaratory judgment action regarding the validity of an annexation ordinance passed while the municipality is in default on a prior plan of services. In *State ex rel. Allen v. City of Newport*, 422 S.W.3d 567 (Tenn. Ct. App. 2013), we recognized that, "[r]ead in a vacuum, [§ 102(b)(5)] does not explain how anyone is supposed to establish that a city is actually 'in default,' who has the legal standing to complain initially that a city is 'in default,' or what criteria has to be utilized in order to determine whether a city may actually be adjudged to be 'in default.'" *Id.* at 575. Nonetheless, we found that the plaintiff-landowners in *Allen* could seek a declaratory judgment on the validity of the ordinance that annexed their territory based on an allegation that the annexation exceeded the municipality's authority under § 102(b)(5). *Id.* at 576. We reasoned that the plaintiffs "raised a colorable claim that the ordinance [was] void pursuant to the statute" because § 102(b)(5) required "compliance with the [c]ity's earlier plans of services." *Id.* at 576–77 (citations omitted).

Unlike Plaintiffs in this case, the plaintiffs in *Allen* owned property in the territory annexed by the ordinance they were seeking to void. *See id.* at 568. Here, Plaintiffs do not seek a declaratory judgment on the validity of the Area 4 and Area 12 annexations; instead,

---

[6] On appeal, Plaintiffs contend that the trial court erred "by not allowing Plaintiffs to amend their Complaint." The City argues that the trial court "properly denied" the motion. Neither party cites to where the trial court's denial can be found. Our review of the record does not reveal that the trial court ruled on the motion to amend. Regardless, the record shows that the parties submitted briefs and presented oral argument on whether Plaintiffs were entitled to "additional relief" under § 102(b)(5), and the trial court ruled on the merits of the issue in its Order of September 14, 2020. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Tenn. R. Civ. P. 15.02.

they seek a declaratory judgment on the validity of all **other** annexations by the City since 1981, when the City allegedly defaulted on the Plans of Services. Plaintiffs argue that the City's violations of § 102(b)(5) "redirected City resources from the previously annexed areas to Plaintiffs' detriment." We find this alleged injury is insufficient to establish standing for a declaratory judgment on the validity of the other annexations.

"Courts use the doctrine of standing to determine whether a litigant is entitled to pursue judicial relief as to a particular issue or cause of action." *City of Memphis v. Hargett*, 414 S.W.3d 88, 97 (Tenn. 2013). "Constitutional standing . . . is one of the 'irreducible . . . minimum' requirements that a party must meet in order to present a justiciable controversy." *Id.* at 98 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Three elements are necessary to establish constitutional standing:

> 1) a distinct and palpable injury; that is, an injury that is not conjectural, hypothetical, or predicated upon an interest that a litigant shares in common with the general public; 2) a causal connection between the alleged injury and the challenged conduct; and 3) the injury must be capable of being redressed by a favorable decision of the court.

*Fisher v. Hargett*, 604 S.W.3d 381, 396 (Tenn. 2020). "While the causation element is not onerous, it does require a showing that the injury to a plaintiff is 'fairly traceable' to the conduct of the adverse party." *City of Memphis*, 414 S.W.3d at 98 (quoting *Am. Civil Liberties Union of Tennessee v. Darnell*, 195 S.W.3d 612, 620 (Tenn. 2006)).

Here, Plaintiffs' alleged injury—the deprivation of city funds—is not "fairly traceable" to the allegedly ultra vires annexations. It is speculative at best to conclude that, but for the other annexations, the City would have provided the services that Plaintiffs allege they are entitled to. Tennessee Code Annotated § 6-51-102(b)(1) requires municipalities to adopt a plan of services before annexing territory, and Tennessee Code Annotated § 6-51-108(e) gives the owners of property in annexed territory a right of action to enforce the plan of services for that territory. But there is nothing in the annexation statutes that entitles Plaintiffs an interest in city funds beyond the interest they share in common with other citizens of Chattanooga. *See* Tenn. Code Ann. § 6-51-108(a) ("Residents of, and persons owning property in, annexed territory shall be entitled to rights and privileges of citizenship, in accordance with the annexing municipality's charter, immediately upon annexation as though such annexed territory had always been a part of the annexing municipality."). Thus, even if Plaintiffs could show that the City over-extended itself by providing services for other annexed territories, the injury would not be unique to Plaintiffs. "Standing . . . may not be predicated upon an injury to an interest that the plaintiff shares in common with all other citizens." *Bowers v. Estate of Mounger*, 542 S.W.3d 470, 479 (Tenn. Ct. App. 2017) (citing *Mayhew v. Wilder*, 46 S.W.3d 760, 767 (Tenn. Ct. App. 2001)). "Were such injuries sufficient to confer standing, the State would be required to defend against 'a profusion of lawsuits' from taxpayers, and a purpose of

the standing doctrine would be frustrated." *Id.* (quoting *Parks v. Alexander*, 608 S.W.2d 881, 885 (Tenn. Ct. App. 1980)).

Moreover, a declaration that the other annexations are void for violation of § 102(b)(5) would not redress Plaintiffs' alleged injury. Section 102(b)(5) provides municipalities with a strong incentive to complete prior plans of services, but it does not require municipalities to actually complete the plans. The mechanism for enforcing a plan of services is contained in § 108(e).

Based on the foregoing, we find Plaintiffs lacked standing to bring a declaratory judgment action to declare the City's other annexations void based on the City's violation of Tennessee Code Annotated § 6-51-102(b)(5). Accordingly, we find the trial court did not err by ruling that Plaintiffs were not entitled to any additional relief under § 6-51-102(b)(5).

## II. APPLICATION OF TENNESSEE CODE ANNOTATED § 6-51-108(C)
### THE REPORTING REQUIREMENT

Tennessee Code Annotated § 6-51-108(c) requires municipalities to prepare and publish annual reports of the progress made in the preceding year toward the extension of services, and it allows property owners to "file suit for mandamus to compel the governing body to comply" with this reporting requirement. The City argues that the reporting requirement in § 108(c) is inapplicable because it was not enacted until after the Area 4 and 12 annexations were complete. Plaintiffs contend the trial court should have ordered the City to provide reports "at the beginning of proceedings." We will address each argument in turn.

### A. Application of § 6-51-108(c)

The Chattanooga Board of Commissioners passed the ordinances annexing Area 4 and Area 12 in 1972. The annexations were not "operative," however, until late 1974, after the Tennessee Supreme Court upheld the ordinances' validity in *State ex rel. Hicks v. City of Chattanooga*, 513 S.W.2d 780 (Tenn. 1974). *See* Tenn. Code Ann. § 6-51-103(e) (stating that ordinances upheld on appeal in quo warranto actions do not become operative until after entry of judgment). Meanwhile, the Tennessee General Assembly passed chapter 753 of the public acts of 1974 ("the 1974 Act"), which added the reporting requirement now codified as amended in Tennessee Code Annotated § 6-51-108(c). *See* Act of Mar. 28, 1974, § 3, 1974 Tenn. Pub. Acts 1111, 1112–13. The 1974 Act provided in relevant part as follows:

> Upon the expiration of a year from the date any annexed area for which a plan of service has been adopted becomes a part of the annexing municipality, and annually thereafter until services have been extended according to such plan, there shall be prepared and published in a newspaper

of general circulation in the municipality a report of the progress made in the preceding year toward extension of services according to such plan, and any changes proposed therein, and the governing body of the municipality shall publish notice of a public hearing on such progress reports and changes, and hold such hearing thereon. Any changes in the plan of service shall be incorporated in a resolution approved by the governing body of the municipality. Any owner of property in an annexed area to which such plan and progress report are applicable may file a suit for mandamus to compel the governing body to comply with the requirements of this paragraph.

*Id.* The 1974 Act became effective in April 1974, *id.* at 1115, three months before *Hicks* was decided.

On the same day it decided *Hicks* in July 1974, the Court decided a companion quo warranto action, *State ex rel. Hudson v. City of Chattanooga*, 512 S.W.2d 555 (Tenn. 1974). In *Hudson*, the plaintiffs attempted to rely on a section of the 1974 Act that provided "[t]he municipality shall have the burden of proving at an annexation ordinance is reasonable for the overall well-being of the communities involved" in quo warranto actions. *Id.* at 559 (quoting § 4, 1974 Tenn. Pub. Acts at 1113). The Court found this amendment was inapplicable because the 1974 Act also provided, "Nothing in this Act shall affect annexation proceedings initiated prior to the effective date of this Act." *Id.* at 559 (quoting § 6, 1974 Tenn. Pub. Acts at 1114).

Relying on the decision in *Hudson* and the language in Section 6 of the 1974 Act, the City contends that the trial court erred by "retroactively" applying the reporting requirement to the annexation of Area 12. We respectfully disagree.

Section 6 of the 1974 Act stated that "[n]othing in this Act shall affect **annexation proceedings** initiated prior to the effective date of this Act." 1974 Tenn. Pub. Acts at 1114. But the annual reporting requirement in Section 3 of the 1974 Act did not "affect" the "annexation proceedings" for Area 4 and Area 12.[7] The reporting requirement in Section 3 operated prospectively to enhance post-annexation accountability for municipalities. *See* Frederic S. Le Clercq, *Tennessee Annexation Law: History, Analysis, and Proposed Amendments*, 55 Tenn. L. Rev. 577, 597–98 (1988). The amendment was enacted in response to a Legislative Council Committee report that recommended changes to plans of services be approved by voters in the newly annexed area. *See id.* at 595–96 (quoting Legislative Council Committee, *Study on the Adjustment of Municipal Boundaries* (1973)).

---

[7] The 1974 Act specified that "[a]nnexation proceedings shall be considered as initiated upon passage on first reading of an ordinance of annexation." § 5, 1974 Tenn. Pub. Acts at 1113. The record does not indicate when the first readings of the ordinances were passed, but the third and final readings were passed on February 2, 1972. Thus, the annexation proceedings were initiated prior to the 1974 Act's effective date of April 5, 1974.

Article I, section 20 of the Tennessee Constitution provides that "no retrospective law, or law impairing the obligations of contracts, shall be made." For the purpose of this section, "a retrospective statute is one which operates forward but looks backward in that it attaches new consequences or legal significance in the future to past acts or facts that existed before the statute came into effect." *Estate of Bell v. Shelby Cnty. Health Care Corp.*, 318 S.W.3d 823, 836 n.4 (Tenn. 2010). The reporting requirement in Section 3 of the 1974 Act did not attach "new consequences or legal significance" to past acts by the City because the annexation ordinances for Area 4 and Area 12 were still being challenged and had not become operative. *See* Tenn. Code Ann. § 6-51-103(e).

Furthermore, the Supreme Court's holding in *Hudson* is not to the contrary. The amendment at issue in *Hudson* shifted the burden of proof in quo warranto actions to the municipality. *See* 512 S.W.2d at 559. "Because the burden of proof, if not a rule of substantive law in and of itself, always affects substantive rights, it makes sense that statutes altering the burden of proof should not be applied retroactively." *State v. Odom*, 137 S.W.3d 572, 609 (Tenn. 2004) (Barker, J., dissenting).

For these reasons, we find no error in the trial court's determination that the City had to comply with Tennessee Code Annotated § 6-51-108(c).

## B. Enforcement of § 6-51-108(c)

Plaintiffs contend that the court should have enforced § 6-51-108(c) "from the very outset, before discovery in this case began." They insist that the court's failure to require reports allowed the City to use its violation of the statute "as a defense vehicle to prolong and corrupt the discovery process," which "created a massive and costly discovery burden for Plaintiffs." Plaintiffs fail, however, to cite the record to show they ever requested an order for the City to publish a report of its progress **before discovery began**, and they fail to cite the record to show where the trial court denied such request, if made. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. App. R. 6(a). Accordingly, we find Plaintiffs have waived this issue.

Plaintiffs also argue that the trial court erred by finding "that it could not compel reports retroactively and could only compel annual reports going forward" in its Order of October 11, 2018.

The trial court's Order of October 11, 2018 was entered after the parties completed a two-week trial on whether the City complied with the Plans of Services. In addition to ruling on that issue, the court ruled on the renewed Motion for Summary Judgment that Plaintiffs filed in February 2017. In that motion, Plaintiffs requested summary judgment "relative to the City's violation of T.C.A. § 6-51-108(c)" and requested "the City be compelled to comply with the requirements of T.C.A. § 6-51-108(c)." The trial court took the motion under advisement after a hearing on May 25, 2017.

Significantly, on the same day that the trial court took their motion under advisement, Plaintiffs agreed to a trial date in July 2017. Shortly before trial was to begin, the court entered another order stating it was reserving its ruling on Plaintiffs' renewed Motion for Summary Judgment. Despite the unresolved motion, Plaintiffs proceeded to and participated in the trial without objection.

In its Order of December 11, 2018, the court found that the City's past violations of § 108(c) were moot:

> The Court can only compel annual reports going forward, and cannot punish the City for failing to provide such reports in the past. Requiring the City to submit the annual reports for earlier than the present year would have had no beneficial effect because the parties were already preparing to try the issues under subsection (e). . . . Claims relating [to] violations of Subsection (c) are, therefore, deemed moot, as it has no ongoing operative impact on the current litigation.

On appeal, Plaintiffs contend that "[b]ecause the parties were already preparing to try the issues under subsection (e), a report on the City's progress to the present date would have had a *profoundly beneficial* effect on Plaintiffs' ability to exercise their rights by reduc[ing] the burden on [Plaintiffs]." Significantly, however, Plaintiffs fail to identify any factual basis for this conclusory statement. Moreover, when the court entered its order in December 2018, the parties had completed a two-week trial on whether the City complied with the Plans of Service. Thus, a favorable judgment in December 2018 would not have provided Plaintiffs with any meaningful relief.

For the foregoing reasons, we find no reversible error in this regard.

### III. APPLICATION OF TENNESSEE CODE ANNOTATED § 6-51-108(E)
#### *THE RIGHT OF MANDAMUS*

Plaintiffs raise two issues regarding the trial court's application of Tennessee Code Annotated § 6-51-108(e) that we will address in turn. First, Plaintiffs contend that the trial court erred by imposing an incorrect burden of proof. Second, they contend that the trial court erred by finding that the City complied with the Area 4 Plan of Services.

The City raises seven issues regarding § 108(e). First, the City contends that the trial court erred by retroactively applying § 108(e). Second, it contends that Plaintiffs lacked standing under § 108(e). Third, it contends that Plaintiffs' § 108(e) claim was barred by the applicable statute of limitations. Fourth, it contends that Plaintiffs' § 108(e) claim was barred by the doctrine of laches. Fifth, it contends that the trial court erred when it found the City failed to materially and substantially comply with the Area 12 Plan of Services. Sixth, it argues that the trial court erred by finding that the City's failure to comply was not

due to unforeseen circumstances. And seventh, the City argues that the scope of the writ of mandamus exceeded the court's authority.

A. Retroactive Application of Tennessee Code Annotated § 6-51-108(e).

As a threshold matter, we consider the City's contention that the trial court erred by retroactively applying the right of mandamus in § 6-51-108(e) to the Area 4 and Area 12 annexations. The City argues that § 108(e) is part of a "new system of annexation by ordinance" that was not in effect when Area 4 and Area 12 were annexed in 1972. We respectfully disagree.

The authority to annex territory by ordinance was created in 1955 when the General Assembly passed chapter 113 of the public acts of 1955 ("the 1955 Act"). *See* Act of Mar. 1, 1955, § 2, 1955 Tenn. Pub. Acts 382, 383. Six years later, the General Assembly added the plan of services requirement with the enactment of chapter 320 of the public acts of 1961 ("the 1961 Act"). *See* Act of Mar. 8, 1961, § 1, 1961 Tenn. Pub. Acts 893, 893–94.

The 1961 Act provided that, before annexing a territory, the municipality must "adopt a plan of service setting forth at a minimum the identification and projected timing of municipal services proposed to be extended into the territory proposed to be annexed." *Id.* Accordingly, before annexing Area 4 and Area 12 in 1972, the City's Board of Commissioners adopted a plan of services for each area.

Two years later, the General Assembly passed the 1974 Act, which added a non-exhaustive list of services that each plan of services must identify. *See* § 1, 1974 Tenn. Pub. Acts at 1112. As discussed, the 1974 Act also added the annual reporting requirement. *See id.* § 3, 1974 Tenn. Pub. Acts at 1112–13 (codified as amended in Tenn. Code Ann. § 6-51-108(c)).

The right of mandamus in § 108(e) was not added until 1998. *See* Act of May 1, 1998, § 21, 1998 Tenn. Pub. Acts 1157, 1175. Nevertheless, in *State ex rel. Cain v. City of Church Hill*, No. E2007-00700-COA-R3-CV, 2008 WL 4415579 (Tenn. Ct. App. Sept. 30, 2008), we held that the right of mandamus in § 108(e) is "clearly a remedial right" that could be applied retroactively. *Id.* at *6. The City does not contest our decision in *Cain*, which addressed the application of § 108(e) to a 1988 annexation. *See id.* at *1. Instead, the City argues the retroactive application of § 108(e) is limited to post-1974 annexations because the 1974 Act "created a completely new system for annexation by ordinance." The City asserts that the 1974 Act "changed the methodology for annexation by ordinance" because it expanded the content requirements for plans of services and added the reporting requirement. We disagree.

The annexation statutes were amended numerous times before and after 1974. *See, generally*, Le Clercq, *supra*, at 589–609 (surveying the amendments passed between 1955

- 19 -

and 1988). Although the 1974 Act was a "major revision of the 1955 Act," *id.* at 595, "the framework established [by the 1955 Act] remained largely intact" after 1974, *id.* at 583. Moreover, the amendment to the plan of services requirement did not substantively change a municipality's obligation. As originally enacted in the 1961 Act, the plan of services requirement provided as follows:

> Provided, however, that before any territory . . . may be annexed under this section, the governing body of the municipality shall adopt a plan of service setting forth at a minimum the identification and projected timing of municipal services proposed to be extended into the territory proposed to be annexed.

> Provided, further that before any such plan of service shall be adopted, it must have been submitted to the local planning commission, if there be such, for study and a written report, to be rendered within ninety (90) days after such submission, unless by resolution of the governing body a longer period is allowed.

§ 1, 1961 Tenn. Pub. Acts at 893–94.

Section 1 of the 1974 Act clarified, but did not change, the plan of services requirement:

> SECTION 1. Tennessee Code Annotated, Section 6-309 is amended by adding, after the first sentence of the second paragraph, the following:

> The plan of services to be identified, shall include but be not limited to police protection, fire protection, water service, electrical service, sanitary sewage system, solid waste disposal, road and street construction and repair, recreational facilities, and the zoning services which the municipality shall enact for the territory proposed to be annexed; provided such services which are being provided such plan may except such services which are being provided by another public agency or private company for the area to be annexed.

1974 Tenn. Pub. Acts at 1112. As already discussed, Section 3 of the 1974 Act added a prospective annual reporting requirement along with a right of mandamus to compel compliance. *See id.* at 1112–13.

We find nothing in the language of the 1974 Act to support the City's conclusion that the 1974 Act created a "completely new system" or "changed the methodology for annexation by ordinance." Both before and after 1974, municipalities were required to "adopt a plan of service setting forth at a minimum the identification and projected timing of municipal services proposed to be extended into the territory proposed to be annexed."

§ 1, 1961 Tenn. Pub. Acts at 893–94. And there is nothing in the right of mandamus language of § 108(e) that relies on the language added by the 1974 Act. The right of mandamus in § 108(e) permits "[a]n aggrieved property owner in the annexed territory" to "bring an action in the appropriate court of equity jurisdiction to enforce the plan of services." Tenn. Code Ann. § 6-51-108(e).

The City also points out that the 1974 Act expressly stated, "Nothing in this Act shall affect annexation proceedings initiated prior to the effective date of this Act." § 6, 1974 Tenn. Pub. Acts at 1114. The City fails, however, to explain how this language precludes the application of a remedial amendment passed in 1998.

For these reasons, we affirm the trial court's finding that the right of mandamus in Tennessee Code Annotated § 6-51-108(e) may be applied to the 1972 annexations at issue in this case.

### B. Standing Under Tennessee Code Annotated § 6-51-108(e)

The City also contends the trial court erred by finding that Plaintiffs have standing under § 108(e). The City contends that the right of action "is limited to those property owners who owned property at the time of an annexation" and were "aggrieved" by the municipality's failure to comply with the Plans of Services.

"When a statute creates a cause of action and designates who may bring an action, the issue of standing is interwoven with that of subject matter jurisdiction and becomes a jurisdictional prerequisite." *Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004). The first sentence of Tennessee Code Annotated § 6-51-108(e) provides that "[a]n aggrieved property owner in the annexed territory may bring an action in the appropriate court of equity jurisdiction to enforce the plan of services at any time after one hundred eighty (180) days after an annexation takes effect and until the plan of services is fulfilled." We find nothing in this language to indicate that the statute limits the right of mandamus to persons owning property at the time of annexation. We also find instructive the phrase "at any time after one hundred eighty (180) days," which is expansive rather than limiting.

Regarding whether Plaintiffs qualify as "aggrieved" property owners, the City relies on evidence that showed Plaintiffs "had many of the services which were included in the plans of services for Areas 4 and 12" and "were receiving **the majority** of the services contemplated." The City, however, provides no citation to where these facts are located in the record. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. App. R. 6(a). Nevertheless, it is evident that Plaintiffs have not received all of the services identified in the Plans of Services; accordingly, Plaintiffs are aggrieved, and the extent to which they may be aggrieved is of no consequence. Accordingly, Plaintiffs have standing.

## C. Statute of Limitations

The City contends that the 10-year limitation period in Tennessee Code Annotated § 28-3-110(a)(3) bars Plaintiffs' claim under § 6-51-108(e). We respectfully disagree.

The limitation period in § 28-3-110(a)(3) applies to "[a]ll other cases not expressly provided for." Section 6-51-108(e) expressly provides that "[a]n aggrieved property owner in the annexed territory may bring an action in the appropriate court of equity jurisdiction to enforce the plan of services **at any time** after one hundred eighty (180) days after an annexation takes effect and **until the plan of services is fulfilled**." (emphasis added). Thus, the plain language of the statute precludes application of the limitation period in § 28-3-110(a)(3).[8]

## D. Doctrine of Laches

Alternatively, the City contends that Plaintiffs' § 108(e) claims should have been barred by the equitable doctrine of laches because they filed their Complaint over 12 years after they first bought property in the area. The trial court rejected this argument because, *inter alia*, Dr. Little purchased additional property in the affected area in 2011, the same year that Plaintiffs commenced this action.

The application of laches lies within the discretion of the trial court and "will not be reversed except on a showing of an abuse of discretion." *John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp.*, 715 S.W.2d 41, 46 (Tenn. 1986). The doctrine of laches has been described as follows:

> Under the defense of laches, "equity will not intervene on behalf of one who has delayed unreasonably in pursuing his rights." Laches, if applicable, requires more than mere delay. It requires an unreasonable delay that prejudices the party seeking to employ laches as a defense, and it depends on the facts and circumstances of each individual case.

*Long v. Bd. of Prof'l Resp. of Supreme Ct.*, 435 S.W.3d 174, 181–82 (Tenn. 2014) (quoting *Dennis Joslin Co. v. Johnson*, 138 S.W.3d 197, 200 (Tenn. Ct. App. 2003)).

We find no abuse of discretion in the trial court's decision. As the court noted, Dr. Little purchased property in the affected area as late as 2011, the same year this suit was commenced. Plaintiffs' lawsuit was delayed in part by their lobbying efforts to have the City voluntarily provide the services they now seek to compel. Further, the City provides no factual basis on which to conclude it was prejudiced by the delay.

---

[8] We note that the City has not raised any issue regarding a statute of repose.

## E. Burden of Proof

Plaintiffs contend that the trial court "misinterpret[ed] the burden on aggrieved property owners" in § 108(e). Stated another way, they contend the court "erred as to what [§ 108(e)] requires an aggrieved property owner to prove." More specifically, they argue that "the Court should not have forced the Plaintiffs to prove the City's compliance or lack thereof as to the City's provision of every service to every property in both annexed territories" and "[i]t should have been enough for the Plaintiffs to prove that their properties did not have access to the services."[9] Plaintiffs do not, however, cite the record to show where the trial court made these alleged errors. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. App. R. 6(a)(1).

Appellate courts are courts "of appeals and errors," and are "limited in authority to the adjudication of issues that are presented and decided in the trial courts, and a record thereof preserved as prescribed in the statutes and Rules of this Court." *Dorrier v. Dark*, 537 S.W.2d 888, 890 (Tenn. 1976)). But "this Court is not charged with the responsibility of scouring the appellate record for any reversible error the trial court may have committed." *Cartwright v. Jackson Capital Partners, Ltd. P'ship*, 478 S.W.3d 596, 614 (Tenn. Ct. App. 2015) (quoting *Owen*, 2011 WL 6777014, at *4). "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed*, 301 S.W.3d at 615.

Without citation to the record to show where the alleged erroneous actions of the trial court are recorded, *see* Tenn. Ct. App. R. 6(a)(1), where Plaintiffs' challenge to the error is recorded, *see id.* 6(a)(2), where Plaintiffs' prejudice is recorded, *see id.* 6(a)(3), and where evidence of each determinative fact may be found, *see id.* 6(a)(4) and (b), this court is left to speculate on exactly what relief Plaintiffs are seeking and how the authority cited by Plaintiffs is relevant. *See also* Tenn. R. App. P. 27(a)(8) (requiring "[a] short conclusion, stating the **precise** relief sought"). Thus, we find Plaintiffs have waived this multitudinous issue.

---

[9] Plaintiffs also contend that "Phase 1 of discovery and trial as to the City's compliance . . . could and should have been resolved on Plaintiffs' first Motion for Summary Judgment based on the City's own previous carefully documented admissions of default." Plaintiffs describe several purported "admissions" by the City, but they do not cite the record to show where these alleged admissions were made. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. App. R. 6(a)(4), (b). Plaintiffs conclude by asserting that the court's decision "increased the costs of maintaining this suit." Plaintiffs ask the court to "provide relief for the inappropriate burden imposed upon the Plaintiffs."

F. Material and Substantial Failure to Comply with Areas 4 and 12

Both parties challenge certain aspects of the trial court's decisions concerning material and substantial compliance with the Plans of Services. The City contends the trial court erred when it found that the City materially and substantially failed to comply with its obligation under the Area 12 Plan of Services to provide street maintenance and sanitary sewers. For their part, Plaintiffs contend the trial court erred when it found that the City materially and substantially complied with its obligations under the Area 4 Plan of Services to provide street maintenance, storm sewers, and sanitary sewers.[10]

Tennessee Code Annotated § 6-51-108(e) requires trial courts to determine whether a "municipality has materially and substantially failed to comply with its plan of services for the territory in question." The Plans of Services identified eight "services" that would be provided to each area, only three of which are now at issue—street maintenance, storm sewers, and sanitary sewers. The Plans provided in relevant part:

> Services shall be rendered to said area and the persons therein pursuant to the following projected timing:
>
> .    .    .
>
> (c) Street Paving, Street Cleaning and Street Construction during or before the third year following the operative date of the annexation.
>
> .    .    .
>
> (g) Storm Sewers shall be provided during or before the sixth year following the operative date of the annexation.
>
> (h) Sanitary Sewers shall be completed during or before the seventh year following the operative date of the annexation.

The Plans of Services were adopted as resolutions by the Chattanooga Board of Commissioners and later incorporated into the 1972 annexation ordinances. Interpretation of municipal legislation is a question of law that we review de novo. *See Amos v. Metro. Gov't of Nashville and Davidson Cnty.*, 259 S.W.3d 705, 710 (Tenn. 2008). Our review of a trial court's finding of fact is "de novo upon the record of the trial court, accompanied by

---

[10] Plaintiffs do not contest the court's finding that the City materially and substantially complied with its obligation to provide street lighting to Area 4. Plaintiffs also do not contest the court's finding that the City materially and substantially complied with its obligations to provide storm sewers and street lighting to Area 12.

- 24 -

a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d).

"[T]he same rules of construction that apply to statutes apply to municipal legislation." *Amos*, 259 S.W.3d at 710. Our objective is to determine the purpose of an ordinance and permit its effect without restriction or expansion[.]" *Id.* "[B]ecause . . . words are known by the company they keep," we must read them "in the context in which they appear in the statute and in light of the statute's general purpose." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 526 (Tenn. 2010). When the language is clear, "we apply the plain meaning without complicating the task." *In re Est. of Tanner*, 295 S.W.3d 610, 614 (Tenn. 2009).

Thus, when interpreting the plan of service for an annexed territory, "[w]e must assume that the plan's drafters intended the plain meaning of their words." *Cain*, 2008 WL 4415579, at *7. Moreover, "words generally should be 'interpreted as taking their ordinary, contemporary, common meaning . . . at the time . . . enacted.'" *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)); *cf. Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002) ("The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern."). It is only when the language is ambiguous "that we may reference the broader statutory scheme, the history of the legislation, or other sources." *In re Estate of Tanner*, 295 S.W.3d at 614.

Based on the above principles, we will address the parties' arguments regarding compliance with each requirement in turn. For each requirement, we will review the trial court's interpretation of what the Plans required as well as its findings of fact regarding what the City provided.

1. Street Paving, Street Cleaning, and Street Construction in Area 12

The trial court found that the City failed to materially and substantially comply with part (c) of the Area 12 Plan of Service because the City "promised to bring the Area 12 streets to a certain standard." The City contends this was error because the trial court erroneously relied on evidence of modern street standards.

The Plans of Services were adopted as resolutions by the Chattanooga Board of Commissioners and later incorporated into the 1972 annexation ordinances. Ordinances should be interpreted using "[t]he same rules of construction used to interpret statutes." *Metro. Elec. Power Bd. v. Metro. Gov't of Nashville & Davidson Cty.*, 309 S.W.3d 474, 477 (Tenn. Ct. App. 2008) (citation omitted). "Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope." *In re Est. of Tanner*, 295 S.W.3d 610, 613 (Tenn. 2009). "[B]ecause words are known by the company they keep, we construe them in the context in which they appear and in light

of the general purpose of the statute." *State v. Jones*, 589 S.W.3d 747, 756 (Tenn. 2019) (quoting *Wallace v. Metro. Gov't of Nashville*, 546 S.W.3d 47, 52–53 (Tenn. 2018)).

When the language is clear, "we apply the plain meaning without complicating the task." *In re Est. of Tanner*, 295 S.W.3d at 614. Thus, when interpreting a plan of services, "[w]e must assume that the plan's drafters intended the plain meaning of their words." *Cain*, 2008 WL 4415579, at *6. Moreover, "words generally should be 'interpreted as taking their ordinary, contemporary, common meaning . . . at the time . . . enacted.'" *Wisconsin Cent. Ltd.*, 138 S. Ct. at 2074 (citing *Perrin*, 444 U.S. at 42); *cf. Planters Gin*, 78 S.W.3d at 890 ("The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern."). It is only when the language is ambiguous "that we may reference the broader statutory scheme, the history of the legislation, or other sources." *In re Est. of Tanner*, 295 S.W.3d at 614.

A plan of services must identify the "services to be delivered." Tenn. Code Ann. § 6-51-102(b)(1). Here, the Plans of Services enumerated eight "services," including "Street Paving, Street Cleaning and Street Construction." The language in the Plan of Services begins by stating that the identified "services" would be provided, and then it simply states, "Street Paving, Street Cleaning and Street Construction during or before the third year following the operative date of the annexation." Significantly, the Plan does not prescribe any specific standard. Thus, and contrary to the trial court's conclusion, the Plan of Services did not obligate the City "to bring the Area 12 streets to a certain standard." Accordingly, we respectfully disagree with the trial court's interpretation of part (c) in the Area 12 Plan of Services. Reading the language of the Plan of Services in context and in light of the general purpose of the statute, we find the City was obligated to provide "Street Paving, Street Cleaning and Street Construction [Services] during or before the third year following the operative date of the annexation."

Although we respectfully disagree with the trial court's conclusion that the Area 12 Plan of Services required the City to bring the Area 12 **streets** to a certain standard by upgrading the Area 12 streets, the evidence does not preponderate against the trial court's findings of fact, which show that the City has provided "Street Paving" to Area 12.[11] In this regard we find it significant that Tennessee Code Annotated § 6-51-102(b)(1) requires a plan of services to identify the "**services** to be delivered." Here, the Plans of Services enumerated eight "**services**." The word "service" is defined as "[l]abor performed in the interest or under the direction of others" or "the performance of some useful act or series of acts for the benefit of another." *Service*, Black's Law Dictionary (11th ed. 2019). "In this sense, *service* denotes an intangible commodity in the form of human effort, such as labor, skill, or advice." *Id.*

---

[11] The parties stipulated before trial that the City provided street cleaning services to Area 12.

Specifically, the trial court found that "[t]he City presented evidence at trial showing that the roadways in Area 12 have been paved and repaved as part of several different projects in the years since annexation." The court also noted that "several large City-wide projects have included Area 12." Plaintiffs do not dispute these findings, which are supported by the record. According to City Engineer William Payne and several trial exhibits, the City responded to service requests and issued work orders for numerous improvements, including "paving and resurfacing, roadway distresses, roadway and driveway requests, sidewalks, . . . . roadway repair and construction, guardrail repairs, sidewalk repairs and construction, and curb repair and construction."

For the foregoing reasons, we affirm the trial court's determination that the City materially and substantially complied with part (c) of the Area 12 Plan of Service as it relates to "Street Paving" in Area 12. However, the issue remains concerning whether the City materially and substantially complied with its responsibilities as they pertain to "Street Construction" in Area 12. Accordingly, we remand with instructions for the court to determine, based on the applicable standards in effect "during or before the third year following the operative date of the annexation," whether the City materially and substantially complied with part (c) of the Area 12 Plan of Service as it pertains to "Street Construction."

2. Street Paving, Street Cleaning and Street Construction in Area 4

As for Area 4, the trial court found that the City materially and substantially complied with its obligation to provide "Street Paving, Street Cleaning and Street Construction" to that Area.[12] The court found that "a significant amount of work has been done since shortly after annexation on the roads in the Area, as they have been paved and repaved multiple times." Plaintiffs contend the court erred because "[t]he City has adopted road design standards" that "require 26-foot pavement width for local roads." We find Plaintiffs' argument unpersuasive.

As we determined above, the City's obligations must be examined according to the applicable standards in effect and/or adopted by the City or otherwise imposed on the City during the relevant periods in which the services were to have been completed. Furthermore, the Plans of Services, as written in 1972, provide no basis for imposing on the City a duty to comply with current standards, meaning those in effect in 2021, nor do they "require 26-foot pavement width for local roads," as Plaintiffs contend. We reach this conclusion because, as we noted above, the words used in the 1972 Plan of Services should be 'interpreted as taking their ordinary, contemporary, common meaning . . . at the time . . . enacted.'" *Wisconsin Cent. Ltd.*, 138 S. Ct. at 2074 (citing *Perrin*, 444 U.S. at 42); *cf. Planters Gin*, 78 S.W.3d at 890.

_____

[12] The parties stipulated before trial that the City provided street cleaning services to Area 4.

The court found that "a significant amount of work has been done since shortly after annexation on the roads in the Area, as they have been paved and repaved multiple times." Accordingly, we affirm the trial court's decision on this issue concerning "Street Paving." However, an issue remains concerning whether the City materially and substantially complied with its obligation to provide "Street Construction" services in Area 4. Accordingly, we remand with instructions for the court to determine, based on the applicable standards in effect "during or before the third year following the operative date of the annexation," whether the City materially and substantially complied with part (c) of the Area 4 Plan of Service as it pertains to "Street Construction."

### 3. Sanitary Sewers in Area 12 and Area 4

With regard to part (h) of the Area 12 Plan of Services, the trial court found that the City failed to materially and substantially comply because the City "failed to provide sanitary sewer service to **all** of Area 12." Conversely, the court found that the City materially and substantially complied with its obligation to provide sanitary sewers in Area 4, despite acknowledging that sanitary sewers were not available to "**all** of Area 4."

The City contends the court's finding regarding Area 12 was in error because the Area 12 Plan of Services did not require the City to build a sanitary sewer system for **all**, meaning 100% of Area 12. For their part, Plaintiffs contend the court's finding regarding Area 4 was in error because the evidence shows that "a large portion of Area 4" did not have access to sanitary sewer lines as of 2018.

The Plans of Services state that "Sanitary Sewers shall be **completed** during or before the seventh year following the operative date of the annexation." Thus, as an initial matter, we note that the language of part (h) differs from that in part (c) because the language in part (h) contemplates the **completion** of "Sanitary Sewers." We also note that part (h) contemplated more than the provision of an intangible commodity, i.e., it evinces an intent to not only **service** existing infrastructure but also to **complete** infrastructure.

That said, we agree with the City that the Plans did not require the installation—or completion—of sanitary sewers for **all** of Area 4 and Area 12 as those areas existed in 2018, as Plaintiffs contend. The words used in Plans should be "interpreted as taking their ordinary, contemporary, common meaning . . . at the time . . . enacted." *Wisconsin Cent. Ltd.*, 138 S. Ct. at 2074 (quoting *Perrin*, 444 U.S. at 42). The 1972 Plans required the completion of the "Sanitary Sewers" for Area 4 and Area 12 "and the persons therein . . . during or before the seventh year following the operative date of the annexation." Thus, the City was obligated to complete sanitary sewers for Areas 4 and 12 and the persons therein as of 1972, as well as persons reasonably contemplated to be in the Areas during or before the seventh year following the operative date of the annexation.

The trial court did not make a finding on whether sanitary sewers were constructed for the Areas "and the persons therein . . . during or before the seventh year following the

operative date of the annexation." When a trial court fails to make a necessary finding, we may remand or "'soldier on' when the case involves only a clear legal issue, or when the court's decision is 'readily ascertainable.'" *Manning v. Manning*, 474 S.W.3d 252, 260 (Tenn. Ct. App. 2015) (citations omitted). Here, we find it appropriate to remand this issue for the trial court to make findings and conclusions of law concerning the scope of the City's obligation under the Plans of Services, determine whether sanitary sewers were constructed for the persons in or contemplated to be in Areas 12 and 4 "during or before the seventh year following the operative date of the annexation," and enter judgment accordingly. *See id.*

### 4. Storm Sewers in Area 4

The trial court found that the City complied with its obligation to provide "Storm Sewers" under part (g) of the Area 4 Plan of Services. Plaintiffs contend this finding was in error because the City installed only a portion of the storm sewer piping called for in a 1971 pre-annexation study commissioned by the City ("the Fringe Area Studies").[13] They further contend that the City could comply with its obligation under part (g) only by installing a "closed-pipe" drainage system throughout the Area that met the specifications called for in the Fringe Studies.

Part (g) of the Plans of Services states that "Storm Sewers shall be **provided** during or before the sixth year following the operative date of the annexation." Thus, like the language in part (h), the language in part (g) evinces an intent to not only **service** existing infrastructure but also to **provide** infrastructure. Accordingly, we interpret the Area 4 Plan of Services as requiring the City to provide storm sewers for Area 4 and the persons therein as of 1972, as well as those reasonably contemplated to be in the Area during or before the sixth year following the operative date of the annexation. There is, however, a dispute and conflicting evidence regarding whether the term "Storm Sewers" meant a closed-pipe system, as Plaintiffs contend, or, as the City contends, a more diverse drainage system that included water conveyances such as open ditches and "green infrastructure."

The City argues that the "Fringe Area Studies" should not be considered when construing the Plans of Services because the Studies were not adopted with the Plans of

---

[13] In 1967, the City commissioned the consulting engineering firm of Hensley-Schmidt, Inc., to prepare a study of the City's fringe areas for purposes of evaluating a long-range annexation program. In pertinent part, the Fringe Area Studies, also referred to as the "Hensley-Schmidt Feasibility Studies," assessed the costs and benefits of annexing several "fringe areas" around Chattanooga, including Areas 4 and 12. The firm published its first "Fringe Area Study for the City of Chattanooga, Tennessee" on August 1, 1967, for fringe areas designated Area 1 through Area 11. Two additional studies were later commissioned and published, the last on November 5, 1971. Following the completion of the studies, the City approved the Plans of Services—Resolutions 9166 and 9168—for Areas 12 and 4. On February 2, 1972, the Commissioners of the City of Chattanooga passed Ordinances 6393 and 6397, which provided for the annexation of Areas 12 and 4.

Services. However, when legislative language is ambiguous, courts "may reference the broader statutory scheme, the history of the legislation, or other sources." *In re Est. of Tanner*, 295 S.W.3d at 614. The Fringe Area Study was not adopted, referenced, or otherwise incorporated into the Plans of Services, but the Fringe Area Studies were prepared for and considered by the City when developing the Plans of Services. Thus, it is appropriate to consider the "Fringe Area Studies" when considering and interpreting the ambiguities in the Plan.

In that the Area 4 Plan of Services obligated the City to "provide" closed-pipe storm sewers, Plaintiffs contend that the evidence preponderates against the trial court's finding that the City complied with its obligation under part (g) of the Area 4 Plan of Services. Again, Plaintiffs point to the Fringe Area Studies, which called for a certain amount of piping, and evidence that showed that the City installed only a small percentage of that piping.

The trial court found that the Fringe Area Studies were not persuasive on this point because the Studies also stated that installation of storm sewers would be based on the Area's need. The court also found other evidence presented at trial showed Area 4 did not need additional, artificial storm sewers:

> The Court is . . . not persuaded by Plaintiffs' arguments regarding the amount of materials contemplated by the Fringe Studies with regard to . . . storm sewers. The Court cannot find that failure to comport with the exact specifications of the Fringe Studies equates to material and substantial failure to comply, especially when the Fringe Studies themselves continually use language that describes providing services consistent with City standards that are naturally subject to change.

> Additionally, the Court finds the City again presented ample evidence with regard to storm sewers and the changing methods by which storm water is controlled, namely the shift to "green infrastructure" described by Mr. Payne. Again, the amount of materials, specified number of feet of storm sewer lines, and other numerical estimates cannot be solely dispositive of whether the City has failed to comply. The actual extent to which services have been provided must be considered. The Court cannot find the City should be responsible for providing or installing artificial lines when witnesses testified for both parties that the natural flow of water in the Area directed storm water to the Tennessee River. While periodic flooding in the Area may be an inconvenience, the Court does not find the City has materially and substantially failed to comply with the Plan of Services by failing to prevent such flooding, and alternate routes are available.

In its analysis of part (g) in the Area 12 Plan of Services, the court found the Fringe Area Studies were unpersuasive based, in part, on the testimony of City Engineer, William

Payne, who described the existing storm drainage systems in place and testified that storm drainage is currently available on Plaintiffs' properties. With respect to the existing drainage systems, Mr. Payne pointed out that the Fringe Studies did not describe a specific location for the installation of storm sewers. Mr. Payne additionally stated that he believed the Fringe Studies could not have meant that both sides of the streets would require storm sewer pipe since they called for approximately 10 miles of pipe along nine miles of streets.[14] Mr. Payne further stated that part (g) of the Plans of Services did not direct the City to install storm sewers on every piece of property in the Area.

Considering that the Fringe Area Studies state, "[t]he construction of storm drainage outfall facilities and the installation of storm drainage within the city streets will be accomplished as the need thereof is determined under the current policies of the city," the trial court also found it relevant that Mr. Payne referenced several documents in his testimony relating to work done on the storm systems in Areas 12 and 4. The court noted Mr. Payne's testimony that since the record system was implemented in 2003, 884 drainage service requests were received by the City for Areas 12 and 4. Mr. Payne explained that these requests would have prompted an investigation by engineers. The court also noted that Mr. Payne considered this in his conclusion that the City had materially and substantially complied with the Plans of Services.

As the trial court noted in its December 11, 2018 Order following phase 1 of the trial, the City's "[f]ailure to adhere to the exact recommendations of the Fringe Studies does not necessarily equate to material and substantial failure to comply." The court further stated:

> The Court heard a considerable amount of testimony describing how the City uses the natural flow of the land as a drainage system quite commonly when it is available as opposed to installing artificial storm sewer systems. . . . However, it also appears that additional storm sewer systems have been installed where needed in accordance with City standards, as the Fringe Studies envisioned. Thus, the Court cannot hold that the City has failed to provide these services.

We agree with the trial court's analysis and conclusion. Tennessee Code Annotated § 6-8-108(e) does not require strict compliance with a plan of services; substantial and material compliance will suffice. The evidence showed the City met this standard. Accordingly, we affirm the trial court on this issue.

---

[14] If the Plan required "closed-pipe" drainage on both sides of the streets referenced, which were nine miles, then eighteen miles would have been needed, not ten.

G. Justifiable Excuse for Failure to Comply

The City contends the trial court erred by finding its failure to provide a sanitary sewer system to Areas 4 and 12 was not "excused" by unforeseen circumstances.

With regard to the questions concerning whether the City "materially and substantially failed to comply" with the Plans of Services to provide a sanitary sewer system and "Street Construction" services to Areas 4 and 12, we have remanded the issues for further consideration consistent with this opinion. Accordingly, this issue is pretermitted until the trial court renders its judgment. If the trial court determines on remand that the City materially and substantially failed to comply with its obligations to provide a sanitary sewer system and street construction services to Areas 4 and 12, the City "shall be given the opportunity to show cause why the plan of services was not carried out." *See* Tenn. Code Ann. § 6-51-108(e). However, the issue shall be moot if the trial court determines that the City materially and substantially complied with its obligations to provide a sanitary sewer system and street construction services to Areas 4 and 12.

H. Scope of Mandamus

The City further contends the trial court exceeded the scope of its authority under Tenn. Code Ann. § 6-51-108(e) by issuing a mandamus that "details specific instructions on where and what types of sewers . . . to install."[15] Because additional findings are necessary to determine whether the City "materially and substantially failed to comply" with the Plans of Services regarding sanitary sewer system and street construction services to Areas 4 and 12, we must also vacate the trial court's writ of mandamus.

In the interest of judicial economy, we note that the scope of any mandamus must be constrained to the scope of the Plans of Services. *See* Tenn. Code Ann. § 6-51-108(e) ("[T]he court shall issue a writ of mandamus to compel the municipality to provide **the services contained in the plan**[.]" (emphasis added)). As noted earlier, the Plans of Services must be interpreted first according to their plain language in the context in which

---

[15] The City also appealed the scope of the trial court's order related to street services for Area 12. Because we have reversed the finding that the City failed to provide street paving and construction under the Area 12 Plan of Services, we do not address that portion of the court's order. The City also contends that the trial court erred by enjoining the City from any further annexations until the services had been provided and by denying in part the City's motion to stay enforcement of the mandamus pending appeal. The City, however, fails to cite legal authority or otherwise develop any argument in support of these issues. Accordingly, we find the City has waived these issues. *See Sneed*, 301 S.W.3d at 615.

Plaintiffs' contend the trial court erred by omitting from the writ of mandamus 1,300 acres that were allegedly de-annexed from in Area 12 in 2003. Once again, Plaintiffs fail to include any citations to the record. Accordingly, we find Plaintiffs have waived this issue. *See* Tenn. R. App. P. 27(a)(7); *Bean*, 40 S.W.3d at 55 ("Plaintiff's failure to comply with the Rules of Appellate Procedure and the rules of this Court waives the issues for review.").

they were written. *See Cain*, 2008 WL 4415579, at *7 ("We must assume that the plan's drafters intended the plain meaning of their words."). Moreover, "[w]hen the details of performance require a public official to exercise judgment he may be compelled by mandamus to perform the duty but his judgment concerning the details of performance is left unfettered." *Bradley v. State ex rel. Haggard*, 438 S.W.2d 738, 740 (Tenn. 1969). In other words, "[w]hile mandamus can be used to require public officials to carry out their duty, it cannot be used to affect their judgment or discretion concerning how they perform their duty." *State ex rel. Hayes v. Civ. Serv. Comm'n of Metro. Gov't of Nashville & Davidson Cty.*, No. 01-A-01-9002-CH00061, 1990 WL 165073, at *3 (Tenn. Ct. App. Oct. 31, 1990) (citations omitted).

Although the Plans required the completion of the "Sanitary Sewers" before the seventh year for "said area and the persons therein," they did not require the installation— or completion—of sanitary sewers for all of Area 4 and Area 12 **as those areas existed in 2018**, as Plaintiffs contend. Moreover, the Plans did not specify a particular type of sanitary sewer to be used. The Plans were adopted in 1972 and stated that the enumerated services would be provided "to said area and the persons therein." Thus, the Plans of Services required that the "Sanitary Sewers" be "completed" for Area 4 and Area 12 "and the persons therein" as that area and those persons existed during or before the seventh year following the operative date of the annexation.

Accordingly, if the trial court finds the City failed to materially and substantially comply with the sanitary sewer service provisions in the Plans of Services, the court may issue a writ of mandamus compelling the provision/completion of these services "to said area and the person therein" as that area and those persons existed during or before the seventh year following the operative date of the annexation. If the court finds the City failed to materially and substantially comply with the street construction provisions in the Plans, the court may issue a writ of mandamus compelling the provision of this service "to said area and the person therein" as that area and those persons existed during or before the third year following the operative date of the annexation.

Moreover, because the Plans of Services do not identify "a certain standard," the standards to be applied in determining whether the City has materially and substantially complied with the Plans of Services are the applicable standards the City adopted or which were imposed on the City as a matter of law that were in effect "during or before the seventh year following the operative date of the annexation" for sanitary sewers and "during or before the third year following the operative date of the annexation" for street construction services. Furthermore, the City's "judgment concerning the details of performance" must be "left unfettered." *See Bradley*, 438 S.W.2d at 740.

IV. SANCTIONS UNDER TENNESSEE RULE OF CIVIL PROCEDURE 37

In an attempt to simplify what is most certainly a complex matter, the gravamen of this issue is whether the trial court abused its discretion by imposing financial sanctions

against the City for not producing an accurate map of Area 12 until three years after this action was commenced and, more specifically, following numerous discovery requests by Plaintiffs that should have resulted in the City producing the map at an earlier date.

The genesis of this issue is the City's adoption of the Area 12 Plan of Services (City of Chattanooga Resolution No. 9166) on January 25, 1972. The City attached to the Plan of Services a map depicting the boundaries of Area 12 ("the Plan Map"). In particular, the Plan Map depicted a winding boundary between Area 12 and Area 4:



One week later, on February 2, 1972, the City passed Ordinance 6393, annexing Area 12 into the City's corporate limits ("the Annexation Ordinance"). Attached to Ordinance 6393 was a different map of Area 12 ("the Ordinance Map"). Significantly, the Ordinance Map depicted a different boundary between Area 12 and Area 4:



It is undisputed that the second map—the Ordinance Map—depicts the correct boundaries of Area 12.[16]

This action was commenced nearly 40 years later, in May 2011. At that time, the City provided Plaintiffs with a copy of the Annexation Ordinance; the City did not, however, provide Plaintiffs with a copy of the Ordinance Map. A short time later, the City provided Plaintiffs with a copy of the Area 12 Plan of Services and a copy of the Plan Map. Plaintiffs subsequently filed their First Amended Complaint in late-May 2011, to which they attached copies of the Annexation Ordinance, the Area 12 Plan of Services, and the Plan Map—which depicted the incorrect boundary between Area 12 and Area 4.

The parties then proceeded to conduct discovery into the services provided to Area 12 using the boundary lines depicted on the Plan Map. During discovery, the City prepared and produced numerous additional maps to show the services provided to Area 12, including a Sanitary Sewer Map, a Storm Water Map, and a Capital Improvements Map. Because these maps were derived from the incorrect Plan Map, they were all incorrect as well.

Almost three years after the commencement of this action, and following extensive and contentious discovery and trial preparation, the parties proceeded to the first trial in January 2014. At or around the start of trial, the City provided Plaintiffs with a copy of the Ordinance Map for the first time.[17] After opening arguments but before the first witness was called on February 4, 2014, one of the City's attorneys, Keith Reisman, announced that he had discovered the discrepancy in the boundary lines depicted in the Plan Map and the Ordinance Map. Mr. Reisman stated that he first noticed the difference only three days prior, and he asserted that the discrepancy revealed that two of Plaintiffs' properties were actually in Area 4. As a consequence of this significant development, the parties agreed to continue the trial.

A few days later, Plaintiffs filed a Motion for Default Judgment and/or Other Appropriate Sanctions. Plaintiffs sought sanctions "pursuant to T.C.A. § 6-51-108 and

---

[16] There is no evidence in the record of why the boundary between Area 12 and Area 4 changed. The boundary depicted on the Plan Map is consistent with the boundaries depicted in the 1968 and 1971 Fringe Area Studies. The City has suggested the change was due to a Tennessee Valley Authority transmission line. The Ordinance Map states that it was "[r]evised" on "January 24, 1972"—one day before the Area 12 Plan of Services was adopted in its third and final reading. Thus, we infer that the old, incorrect Plan Map was inadvertently left attached to the Plan of Services and replaced in Ordinance 6393, which was passed a week later.

[17] In their Motion for Sanctions, Plaintiffs alleged that the Ordinance Map was not given to them until the morning of February 4, 2014—several days after trial started. In their Response to the Motion for Sanctions, the City alleged that the Ordinance Map was produced to Plaintiffs shortly before trial began. Either way, it is undisputed that Plaintiffs did not receive a copy of the Ordinance Map until after the first pre-trial discovery period closed.

Rules 34A.02, 37.04, and 37.02 of the Tennessee Rules of Civil Procedure." Plaintiffs alleged numerous discovery abuses by the City, but the principal matter at issue was the City's last-minute production of the Ordinance Map. In pertinent part, Plaintiffs asserted that the production of the Ordinance Map was the "most recent attempt to improperly delay and/or disrupt th[e] trial." Plaintiffs also argued that their efforts to ascertain the boundaries of Area 12 had been reliant on the City because the City was "the *only* entity that retain[ed] and provide[d] the definitive and official version of this data." Plaintiff's asserted that sanctions, including the award of attorney's fees and expenses, were warranted because they would have to amend their Complaint and engage in additional discovery to obtain the relief that they originally sought—the provision of services to all their properties.

In response to the Motion for Sanctions, the City pointed the finger at Plaintiffs, asserting that the error originated with, and was perpetuated by, Plaintiffs' use of the Plan Map in their Complaint and discovery requests. The City further argued that "none of its actions in providing large amounts of discovery documents for services provided following this 1972 annexation of property partially within Area 12 constituted bad faith noncompliance under Tennessee law" because the error ultimately could be traced to the 1972 revision of maps between the time the Plan of Services was adopted and the Annexation Ordinance was passed. The City asserted that the discrepancy was disclosed as soon as it "was known by Counsel" and "timely brought to the Court's attention and to the attention of Counsel for the Plaintiffs before trial."

Following a hearing on the Motion for Sanctions, the trial court announced its ruling from the bench. Although Plaintiffs did not specifically seek sanctions pursuant to Tennessee Rule of Civil Procedure 37.03, the trial court relied on that rule to impose monetary sanctions against the City in the nature of attorneys' fees and costs resulting from the "delayed revelation." The court acknowledged that there had been no "contumacious" conduct and characterized the failure to disclose as "inadvertent." But the court also noted the maxim, "he who has the higher knowledge or should have the higher knowledge has the higher obligation," and credited Plaintiffs' argument that "the City ought to know where it is they have what and what got passed." The court found that the City's action or inaction "caused essentially a yearlong delay in the resolution of th[e] case" and awarded Plaintiffs "the cost of the additional discovery to be conducted to get [the case] back to where [it was] and should have been" in early 2014.

The court ruled accordingly in its written Order for Sanctions:

[T]he City is the keeper of information and has the higher knowledge, or should have the higher knowledge, relative to its records and the records it produces. The Court further acknowledges the expensive proposition for the Plaintiffs to have to restart discovery after February 5, 2014, so consideration has to be taken concerning the cost of the additional discovery to be conducted by the Plaintiffs. Therefore, the Court's ruling on granting

sanctions is on the City's failure to supplement in a timely fashion under Rule 37.03 of the Tennessee Rules of Civil Procedure with the resulting sanction that Plaintiff's additional discovery expenses, including attorneys' fees, costs and expenses shall be paid by the City. Accordingly, it is hereby:

1. ORDERED, ADJUDGED AND DECREED that the City failed to timely supplement its discovery production under Rule 37.03 of the Tennessee Rules of Civil Procedure; it is further

2. ORDERED, ADJUDGED AND DECREED that the City shall reimburse the Plaintiffs for their expenses, including attorneys' fees, costs and expenses, from February 5, 2014, up through the first day of trial relative to the additional discovery incurred by the Plaintiffs to get this matter back to where this cause was and should have been when trial was set to commence on February 5, 2014; it is further

3. ORDERED, ADJUDGED AND DECREED that the Plaintiffs may file intermediate requests for attorneys' fees, costs and expenses, which shall only be referred to the Clerk & Master for review upon filing of an objection within five (5) days of Plaintiffs filing for intermediate request for attorneys' fees, costs and expenses.

The court subsequently awarded Plaintiffs a judgment against the City for $97,609.51 on their first application, and a judgment against the City for $165,663.57 on their second application for a total award of $263,273.08 for attorneys' fees, costs, and expenses.

On appeal, the City acknowledges that it was in possession of, and had custody and control of, the Ordinance Map at all times material to this action, and it does not dispute that the Ordinance Map was not produced to Plaintiffs until early 2014.[18] But the City insists that Rule 37.03 is inapplicable because "[t]here is no allegation that there was a lack of timely supplementation of the discovery responses." Even if the imposition of sanctions was appropriate, the City argues that the trial court erred by awarding attorneys' fees for the cost of discovery related to Area 4 because "the inadvertent error only required the delay of the original trial date."

Plaintiffs argue that the trial court acted within its discretion by awarding attorneys' fees. They point out that the City furnished Plaintiffs with incorrect information throughout the first pre-trial discovery period, a fact that was revealed by the "discovery" of the

---

[18] Without explanation or reference to the record, the City suggests baldly that "the parties had the information in their possession that showed the discrepancy." We find this assertion unpersuasive in light of the fact that the City admitted that the Ordinance Map was not provided until shortly before trial.

Ordinance Map. They contend that "[t]he City's discovery abuses drove up discovery costs for Plaintiffs, and the trial court simply ordered the City to cover the expenses that would not have been generated but for the City's discovery violations."

We begin our analysis with Rule 37.03, which authorizes the court to impose sanctions when a party "fails to supplement or amend responses to discovery requests as required by Rule 26.05." Tenn. R. Civ. P. 37.03(1). In pertinent part, Rule 26.05 establishes a duty to supplement prior discovery responses that were incorrect when made or are no longer correct:

> A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information thereafter acquired, except as follows:
>
> .    .    .
>
> **(2)** A party is under a duty seasonably to amend a prior response if the party obtains information upon the basis of which the party (A) knows that the response was incorrect when made; or (B) knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

Tenn. R. Civ. P. 26.05.[19] If a party has failed to comply with Rule 26.05, the court may impose sanctions, including attorney fees and expenses caused by the failure:

> A party who without substantial justification fails to supplement or amend responses to discovery requests as required by Rule 26.05 is not permitted, unless such failure is harmless, to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, **the court on motion may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses (including attorney fees) caused by the failure**, these sanctions may include any of the actions authorized under Rule 37.02(A), (B), and (C) and may include informing the jury of the failure to supplement or amend.

---

[19] Subsection (1) is not applicable because the matter at issue does not pertain to the identity and location of persons having knowledge of discoverable matters or the identity of a person expected to be called as an expert witness at trial. Subsection (3) is not applicable because a duty to supplement had not previously been imposed by order of the court, agreement of the parties, or at any time prior to trial through new requests for supplementation.

Tenn. R. Civ. P. 37.03(1) (emphasis added); *see Kirk v. Kirk*, 447 S.W.3d 861, 871 (Tenn. Ct. App. 2013); *Strange v. Strange*, No. E2008-01841-COA-R3-CV, 2010 WL 363304, at *12 (Tenn. Ct. App. Feb. 2, 2010).

Whether to impose sanctions arising from discovery disputes is within the broad discretion of the trial court. *See Strickland v. Strickland*, 618 S.W.2d 496, 501 (Tenn. Ct. App. 1981) (citations omitted) ("The trial court must have wide discretion in [discovery] matters."). Stated another way, "[t]he trial court's determination of the appropriate sanction to be imposed will not be disturbed on appeal unless the court commits an abuse of discretion." *Lyle v. Exxon Corp.*, 746 S.W.2d 694, 699 (Tenn. 1988) (citing *Brooks v. United Unif. Co.*, 682 S.W.2d 913 (Tenn. 1984)). Therefore, we review the trial court's decision to impose monetary sanctions against the City pursuant to the very deferential abuse of discretion standard of review.

The abuse of discretion standard embodies two ideas: "First, it indicates that the trial court has the authority to choose among several legally permissible, sometimes even conflicting, answers. Second, it indicates that the appellate court will not interfere with the trial court's decision simply because it did not choose the alternative the appellate court would have chosen." *BIF, a Div. of Gen. Signals Controls, Inc. v. Serv. Const. Co., Inc.*, No. 87-136-II, 1988 WL 72409, at *2 (Tenn. Ct. App. July 13, 1988) (citations omitted). Thus, the abuse of discretion standard does not allow reviewing courts to substitute their discretion for that of the trial court. *Lee Med., Inc.*, 312 S.W.3d at 524.

Still, the abuse of discretion standard does not "immunize a lower court's decision from any meaningful appellate scrutiny":

> To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a [trial] court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions.

*Id.* at 524–25 (citations omitted).

When applying this framework, "we look first at whether the factual basis for the trial court's decision is supported by evidence in the record." *Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 306 (Tenn. 2020) (citing *Lee Med.*, 312 S.W.3d at 524). We "review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d)." *Lee Med.*, 312 S.W.3d at 525. Here, the pertinent, underlying facts in this case are largely undisputed. The Area 12 Plan of Services was adopted with an incorrect map; the Annexation Ordinance was passed with a correct map. The City was in sole possession, custody, and control of the Annexation

Ordinance and Ordinance Map. It provided Plaintiffs with the Annexation Ordinance, but not the Ordinance Map. Despite the City's sole possession of the Ordinance Map, it generated discovery responses as to the services provided to Area 12 based on the incorrect boundaries depicted in the Plan Map. As a result, when the Ordinance Map was "discovered" in early 2014, the parties realized that extensive, additional discovery was necessary. The trial court based its decision on these facts, which are supported by evidence in the record.

The second question to consider under the abuse-of-discretion framework is whether the trial court properly identified and applied the most applicable legal principles relevant to its decision on Plaintiffs' Motion for Sanctions. *See id.* at 524. When determining whether the trial court applied the correct legal standard, our review is *de novo* with no presumption of correctness. *Fisher v. Hargett*, 604 S.W.3d 381, 395 (Tenn. 2020). The City contends that the trial court did not apply applicable legal principles because Rules 26.05 and 37.03 concern the supplementation of a prior discovery response and the sanctions here were imposed due to a "good faith" discovery of information. While we agree that Rule 37.03 initially appears to be an imperfect fit to the circumstances of this case, we find the trial court applied the most appropriate legal principles.

We first note that "[t]he purpose behind pre-trial discovery is to eliminate surprise and enable the parties to discern what is at issue in preparation for trial." *Denney v. Lovett*, No. M2004-03020-COA-R3-CV, 2006 WL 1915303, at *6 (Tenn. Ct. App. July 11, 2006) (citing *Wright v. United Services Auto Ass'n,* 789 S.W.2d 911, 915 (Tenn. Ct. App. 1990); *Strickland*, 618 S.W.2d at 501. To that end, Rule 26.02 defines the scope of discovery broadly, allowing parties to "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." Tenn. R. Civ. P. 26.02(1). To facilitate this, "parties may obtain discovery by a variety of methods," including "depositions upon oral examination or written questions; written interrogatories; [and] production of documents or things." Tenn. R. Civ. P. 26.01.

Generally, "sanctions can be applied only for a failure to comply with an order of the court." *Strickland*, 618 S.W.2d at 500. However, when a party fails to supplement or amend responses as required by Rule 26.05, Rule 37.03 directs that the party "is not permitted, unless such failure is harmless, to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." Tenn. R. Civ. P. 37.03(1). In addition to or in lieu of this sanction, the court may require the offending party to pay "reasonable expenses (including attorney fees) caused by the failure" to supplement or amend. *Id.* As the trial court correctly noted, Rule 37.03 does not require the conduct to be contumacious.

The City correctly points out that the trial court did not identify a single interrogatory, deposition question, or request for documents that the City was under an obligation to supplement. This assertion misses the forest for the trees. The record is replete with instances where Plaintiffs requested information related to the services provided to Area 12 and the persons therein. The City's initial error in providing an incorrect map of

Area 12's boundaries was so fundamental that it either rendered the City's prior responses incorrect or drew them into question. There is no evidence to contradict the City's assertion that its attorneys did not know about the change in boundary lines until a few days before trial. Nonetheless, as Plaintiffs argued and the trial court correctly noted, the City was not only in possession of this information, but it was also responsible for the creation and maintenance of this information.

A strict reading of the text in Rule 26.05 and Rule 37.03 supports the City's argument that these rules do not apply. Rule 26.05 applies when information is "thereafter acquired." Rule 37.03 applies when a party has failed to supplement or amend "as required by 26.05." Tenn. R. Civ. P. 37.03(1). Nonetheless, the principle behind these rules is that a party who has responsive information has a duty to provide that information in a timely manner. Rule 26.02(1), the bedrock of our rules governing discovery, is "designed for the discovery of facts which will enable litigants to prepare for trial free from the element of surprise." *Strickland*, 618 S.W.2d at 501 (citation omitted). "When the rules do not provide a sanction for those violations which defeat the purpose of rule 26.02(1), it is mandatory that the trial judge have the authority to take such action as necessary to achieve that purpose." *Id.* Thus, the "trial court must have wide discretion in [discovery] matters." *Id.* (citations omitted).

Still, the City points out that Rule 37.03 applies only when the violation is "without substantial justification." Although the trial court did not address this element, we find its analysis complies with this standard. It is undisputed that the City was in possession, custody, and control of the Annexation Ordinance Map since 1972. Moreover, the City offers no justification for its failure to realize that it was in possession of the Annexation Ordinance Map at all material times to this litigation, particularly realizing that such evidence was at the center of the controversy and within the scope of Plaintiffs' numerous discovery requests. Additionally, the City failed to show how Plaintiffs could have obtained the Annexation Ordinance Map but for obtaining it from the City through discovery. Although the City insists its oversight was "substantially justified," as that term is contemplated in Rule 37.03, the trial court disagreed and we find no basis upon which to overturn that finding.

In fairness to counsel for the City, we acknowledge, and Plaintiffs do not dispute, that counsel were unaware that their client, the City of Chattanooga, had the Annexation Ordinance Map. Moreover, the City's counsel produced the Annexation Ordinance Map to the court and Plaintiffs within three days of learning of its existence. As such, we agree with the trial court that counsel promptly produced the map after learning their client was in possession of the map, but that does not excuse the City of its failure to produce the map at a much earlier date.

Based on the foregoing, we find the trial court applied the appropriate legal principles.

The third and final question in the abuse of discretion framework is "whether the trial court's denial of Plaintiffs' motion to alter or amend was within the range of acceptable alternative dispositions." *Harmon*, 594 S.W.3d at 306 (citing *Lee Med.*, 312 S.W.3d at 524). Rule 37 gives trial court's the discretion to award attorney fees caused by a party's noncompliance. *See* Tenn. R. Civ. P. 37.01(4), 37.02(E), 37.03(1). We find no basis upon which to disagree with the trial court's discretionary decision to impose monetary sanctions in this case. As the trial court reasoned, the City was the keeper of information, in this case the Annexation Ordinance Map, and it knew or should have known—i.e., "ha[d] the higher knowledge, or should have [had] the higher knowledge"—about its records. The facts support that reasoning. The record also supports the trial court's finding that the City's failure to produce the Annexation Ordinance Map at a much earlier date was the cause of "the expensive proposition for the Plaintiffs to have to restart discovery after February 5, 2014."

It is well established that "[t]he abuse of discretion standard does not permit an appellate court to substitute its judgment for that of the trial court." *Harmon*, 594 S.W.3d at 306 (quoting *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019)). "Accordingly, if the reviewing court determines that reasonable minds can disagree with the propriety of the decision, the decision should be affirmed." *Id.* Based on the above, we find that the trial court's decision was "within the parameters of the trial court's sound discretion." *Id.* at 307 (quoting *McCaleb*, 582 S.W.3d at 198). Thus, we affirm the trial court's decision to impose monetary sanctions against the City.

Because we have affirmed the trial court's decision to award monetary sanctions, we must consider the City's next issue, which is whether the awards of attorneys' fees and costs related to Area 4 discovery sanctions were in the correct amounts.

The City contends that "the inadvertent error only required the delay of the original trial date" and asserts that there "was no showing of prejudice or extra cost on the part of Plaintiffs because the trial date was delayed." However, in their appellate brief, the City's argument on this issue consists of one paragraph, with no citation to the record or legal authority. Accordingly, the City's brief on this issue fails to comply with Tenn. R. App. P. 27 and Tenn. Ct. App. R. 6. As we have previously held, a "skeletal argument that is really nothing more than an assertion will not properly preserve a claim." *Chiozza v. Chiozza*, 315 S.W.3d 482, 489 (Tenn. Ct. App. 2009) (quoting *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 400 (Tenn. Ct. App. 2006)). Moreover, "the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue." *Bean*, 40 S.W.3d at 55 (citations omitted).

Accordingly, we find the City has waived the issue. We also note that the City's argument grossly downplays the fundamental and far-reaching effects of its failure to disclose the Ordinance Map. This case arises from the annexation of additional territory into the City's limits and its obligation to provide services to the properties within that territory—not just to Plaintiff's property. The Ordinance Map revealed not only that a

portion of Plaintiff's property was in Area 4, but also that a number of prior discovery responses were no longer true or accurate. Thus, substantial amounts of time and money had already been spent on discovery that would, at the very least, need to be revised and reconsidered.

Because the City has not provided any justification for reversing the amounts awarded to Plaintiffs, we affirm the trial court on this issue as well.

## V. ATTORNEY'S FEES AS AN EQUITABLE REMEDY

Plaintiffs contend "the equities of this case demand a greater remedy than that which is afforded by . . . § 6-51-108." In particular, Plaintiffs argue that the court "should have ordered the City to pay Plaintiffs' attorney's fees for the increased costs the City's actions" because the City "needlessly increased the costs of litigation."

The only authority cited by Plaintiffs is *Vaughan v. Atkinson*, 369 U.S. 527 (1962), an admiralty law case in which the United States Supreme Court held that a seaman was entitled to attorneys' fees as damages after the defendant shipowners failed to pay "[m]aintenance and cure."[20] *Id.* at 530–31. The Court reasoned that "while failure to give maintenance and cure may give rise to a claim for damages for the suffering and for the physical handicap which follows, the recovery may also include 'necessary expenses.'" *Id.* at 530 (citations omitted).

Plaintiffs cited no authority for the proposition that they are entitled to "necessary expenses" or that "necessary expenses" would include attorneys' fees under Tennessee law. Section 6-51-108(e) requires courts to "assess the costs of the suit against the municipality" if the court finds "the municipality has failed without cause to comply with the plan of services." However, "[t]he term 'costs' has not generally been construed to encompass attorney fees." *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 310 (Tenn. 2009). Accordingly, we find Plaintiffs are not entitled to an award of attorneys' fees.

Furthermore, as we discussed earlier, Plaintiffs made an election of remedies when pursuing a mandamus action under § 108(e) and allowing Plaintiffs to seek an additional remedy, as they do here, would be inconsistent with the nature of a mandamus action, which is available only when "there is no 'plain or adequate remedy.'" *See Hayes v. Civ. Serv. Comm'n of Metro. Gov't of Nashville & Davidson Cty.*, 907 S.W.2d 826, 828 (Tenn.

---

[20] "Maintenance and cure is designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service; and it extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery." *Vaughan*, 369 U.S. at 531.

Ct. App. 1995) ("Mandamus and damages for the failure to do the thing the mandamus commands are inconsistent remedies.").

Thus, we agree with the trial court's conclusion that Plaintiffs were not entitled to additional relief under § 102(b)(5), but we do so on slightly different grounds than those relied on by the trial court.

## IN CONCLUSION

Based on the foregoing, we reverse the trial court's determination that the City materially and substantially failed to comply with its obligations to provide "Street Paving" for Area 12. We also reverse the trial court's judgment regarding the City's compliance with its obligations to provide "Sanitary Sewers" and "Street Construction" to Areas 4 and 12 and vacate its writ of mandamus compelling completion of the Area 12 Plan of Services and remand for further proceedings consistent with this opinion. We affirm the court's judgment in all other regards. Costs of appeal are assessed equally against the parties, one-half against Plaintiffs and one-half against the City.

_____
FRANK G. CLEMENT JR., P.J., M.S.